**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**DANIEL LEE HALL**,

      **Movant,**

**v.**                               **Civil Action No. 3:12-cv-1039
                                    (Criminal Case No: 3:09-cr-187)**

**UNITED STATES OF AMERICA,**

      **Respondent.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

Pending before the Court is Movant's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 (ECF No. 68). This matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and by Standing Order has been referred to the undersigned United States Magistrate Judge for the submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, the undersigned respectfully **RECOMMENDS** that Movant's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 be denied and this action be removed from the docket of the Court. Given that the undersigned conclusively **FINDS** that Movant is not entitled to the relief requested, an evidentiary hearing is not warranted. *Raines v. United States,* 423 F.2d 526, 529 (4th Cir. 1970).

## I.    <u>Background</u>

On March 7, 2009, Movant Daniel Lee Hall ("Hall") allegedly mailed threatening letters to more than twenty individuals who were prospective jurors in a pending state

criminal action in which Hall was a defendant. (ECF No. 34 at 10).[1] The letters suggested that members of the jury would be in danger of physical harm. Consequently, several recipients of the letter refused to appear for jury duty. (*Id.*). As a result, Hall's trial had to be rescheduled. (*Id*).

On August 18, 2009, a federal grand jury in Charleston returned a four count indictment against Hall. The indictment charged him with three counts of using the United States Postal Service to mail threatening communications, in violation of 18 U.S.C. § 876(c), (ECF No. 1 at 3), and one count of knowingly using intimidation and threats with the intent to hinder, delay and prevent individuals from communicating information regarding a federal offense to a law enforcement officer or judge of the United States, in violation of 18 U.S.C. § 1512(b)(3). (*Id.* at 4).

On May 3, 2010, Hall entered into an agreement with the Government in which he consented to plead guilty to the first count of the indictment in exchange for dismissal of the other three counts. (ECF No. 34 at 1). The written agreement contained several provisions relevant to this § 2255 motion. First, Hall acknowledged that he had read and carefully discussed every part of the agreement with his counsel and understood the terms of the agreement. (*Id.* at 9). He also confirmed the following:

> I further acknowledge that my attorney has advised me of my rights, possible defenses, the Sentencing Guideline provisions, and the consequences of entering into this agreement, that no promises or inducements have been made to me other than those in this agreement, and that no one has threatened me or forced me in any way to enter into this agreement. Finally, I am satisfied with the representation of my attorney in this matter.

(*Id.*). Second, Hall agreed to waive his "right to challenge his guilty plea and his conviction resulting from this plea agreement, and any sentence imposed for the

---

[1] Electronic Case Filing Numbers refer to the documents filed in Hall's criminal proceeding, *United States v. Hall,* Case No. 3:09-cr-00187, United States District Court for the Southern District of West Virginia.

conviction, in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255" unless the motion was based upon a claim of ineffective assistance of counsel. (*Id.* at 6). Third, Hall specifically agreed to waive his right to appeal his sentence, except on limited grounds. (*Id.*). Hall accepted an adjusted offense level of 18 under the Sentencing Guidelines, starting with a base offense level of 12 and adding two levels because the offense involved more than 2 threats and four more levels because the offense resulted in substantial disruption of public and governmental functions. (*Id.* at 5). Hall expressly acknowledged that the Court and the Probation Office were not bound by this calculation under the Sentencing Guidelines, and "the parties shall not have the right to withdraw from the plea agreement due to a disagreement with the Court's calculation of the appropriate guideline range." (ECF No. 34 at 5-6).

Finally, Hall signed a Stipulation of Facts, which set forth the facts comprising the offense of conviction and the relevant conduct for that offense. (*Id.* at 10). Hall stipulated that on March 7, 2009, he knowingly mailed threatening letters to more than twenty individuals, and that the letters contained threats to injure the prospective jurors. (*Id.*). He further acknowledged that as a result of his action, several of the letter recipients refused to appear for jury duty, and his trial was thereafter rescheduled, causing substantial disruption of public and governmental functions. (*Id.*).

On May 19, 2010, the presiding District Judge convened a plea hearing pursuant to Rule 11, *Fed. R. Crim. P.*  At the outset of the hearing, the Court questioned Hall regarding his competency. (ECF No. 60 at 5-8). Hall testified that he was 33 years old; had completed sixth grade and never pursued a GED; he could read and write, and was able to read and understand the indictment and the plea agreement. (*Id.* at 5-6). Hall testified that he had received mental health treatment from Prestera Centers for Mental

Health for approximately one to two years between 2004 and 2007 and felt he had gotten over the problem he was having at that time. (*Id.* at 7). Hall also testified that in the past 48 hours, he had taken 60 milligrams of Celexa, as prescribed by his psychiatrist, and that he had been taking the same dosage daily for the past three months. (*Id.* at 7-8).

The Court reviewed Count One of the indictment in detail, both reading the charge verbatim and taking time to explain to Hall the meaning of the key terms. (*Id.* at 9-10). Hall indicated that he had discussed the indictment with his attorney, who had counseled him as to the nature of the offense and advised him of all possible defenses. (*Id.* at 11).

The Court then reviewed the terms of the plea agreement, taking care to ensure that Hall understood the effect of each provision. (ECF No. 60 at 11-24). The Court verified that Hall agreed to the facts as set forth in the Stipulation of Facts and understood that if he withdrew from the agreement or breached its terms, the government could introduce the stipulation as evidence at trial. (*Id.* at 18-20). The Court reviewed the agreement with respect to the sentencing guideline calculations, and Hall confirmed that he had agreed to waive his right to appeal any sentence falling within the applicable guidelines range for an adjusted offense level of 18. (*Id.* at 21). Hall stated his understanding that he also had waived his right to collaterally attack his conviction and sentence except on the ground of ineffective assistance of counsel. (*Id.* at 22). After reviewing the remaining provisions of the agreement, Hall acknowledged that the plea agreement represented the sole and entire agreement between him and the United States; that he had signed the agreement and initialed each page; and that he approved of the agreement at the time it was reached, at the time he signed it, and in the present

time at the hearing. (*Id.* at 24).

The Court interviewed Hall regarding his understanding of the penalties associated with a conviction on the charge, as well as the civil and constitutional rights he would abandon by entering a guilty plea. (*Id.* at 25-27). Hall understood that he was entitled to the assistance of a lawyer at a trial, and that he had the right to a speedy and public trial by jury, to be confronted with and cross-examine witnesses, to choose not to testify, to be presumed innocent, and that at trial, it would be the Government's burden to prove his guilt beyond a reasonable doubt. (ECF No. 60 at 25-26). Hall confirmed that by pleading guilty, he was waiving these Constitutional rights, in particular his right against self-incrimination and right to a trial by jury. (*Id.* at 27).

Hall explicitly confirmed his understanding that he faced a maximum sentence of five years,[2] and that his attorney was not in a position to tell him where his advisory sentencing guideline would fall. (*Id.* at 27-29). He also denied having been made any promises by anyone of leniency or light sentence or probation, outside of the contents of the plea agreement. (*Id.* at 30). Hall verified that his guilty plea was not made under threat, intimidation, coercion, or pressure to plead guilty. (*Id.* at 30). Hall also stated that he was satisfied with his attorney, that he felt that his attorney had represented him fully and fairly, and had spent a good deal of time with him developing his case. (*Id.* at 30).

Hall again confirmed that the written plea agreement was the entire agreement between him and the United States, and there were no other side agreements; that his plea was voluntary and of his own free will; that he understood that he was waving his

---

[2] Hall additionally acknowledged that by pleading guilty he exposed himself to a fine of up to $250,000, a term of supervised release up to three years, a $100 special assessment, and an order of restitution as set forth in the plea agreement. (ECF No. 60 at 13).

constitutional rights, including his right to a fair and speedy trial by jury; and that he had full knowledge of the consequences of his plea, including the possible five year maximum penalty that the Court could impose. (ECF No. 60 at 31). Hall then signed a written plea of guilty. (*Id.* at 32).

The Court asked Hall to state in his own words what he had done that made him guilty of Count One. (*Id.*). Hall replied, "I made some threatening letters and sent them through the mail to prospective jury members." (*Id.*). Hall confirmed that he did this in connection with a separate case of his that was pending trial in Mason County, West Virginia. (*Id.*). Regarding the letter sent to the victim identified in Count One of the indictment, Hall stated that he instructed another person what to say in the letter; the other person typed the letter on a computer; the letter was printed from the computer; Hall put the letter into an envelope and addressed the envelope; and he accompanied the driver to a post office box in Mason County, where the letter was deposited in the mail. (*Id.* at 38). Hall clarified that he did not personally place the letter in the mailbox, but the letter was placed in the mailbox at his direction. (ECF No. 60 at 34-35). A copy of the letter was produced and Hall read its contents into the record. (*Id.* at 35-36). Hall's attorney verified that "if there were more than one such letter sent, it would all have been identical." (*Id.* at 36). Hall confirmed that the initials of the known person in Count One were the initials of one of the recipients to whom a threatening letter was sent. (*Id.* at 37). Hall confirmed that all parts of the preparation and mailing of the letter occurred in Mason County. (*Id.* at 39). Finally, Hall affirmed that he was pleading guilty because he was, in fact, guilty of the charge contained in Count One of the Indictment. (ECF No. 60 at 39).

After verifying that Hall understood all of the proceedings that had taken place, the Court found that there was a factual basis for Hall's guilty plea and it was entered freely and voluntarily, with full knowledge of the consequences of the plea, including the possible penalty that the court might impose. *(Id.* at 40). The Court found that the plea agreement adequately protected Hall's rights and was in the interests of justice; thus, the Court accepted Hall's plea of guilty and adjudged him guilty of the charge contained in Count One of the indictment. (*Id.*). The remaining counts were dismissed.

On May 17, 2010, Hall appeared for sentencing. (ECF No. 61). He testified that he had read the probation department's presentence report and gone over it thoroughly with his attorney. (*Id.* at 2-3). Hall's counsel conceded that he qualified for a two-level enhancement for obstruction of justice, bringing his adjusted offense level up from 18 to 20. (*Id.* at 4). The Court subsequently deducted three levels from Hall's adjusted offense level for acceptance of responsibility, which brought his total offense level down from 20 to 17, and applied the Criminal History Category of III, as recommended in the presentence report, resulting in an advisory sentencing guidelines range of 30 to 37 months. (*Id.* at 15). Hall's attorney advocated for leniency on his behalf, stressing his difficult upbringing and recent improvement in mental outlook. (*Id.* at 16-17). His attorney also urged the Court to consider a partially concurrent sentence, under U.S.S.G. § 5G1.3(c), so that there would be "some incremental punishment, but not a great deal." (*Id.* at 17). The United States in turn asked the Court to consider Hall's prior criminal history, the serious nature of the instant offense, and evidence of further attempts by Hall to intimidate or manipulate witnesses after he committed the instant offense. *(Id.* at 18-19). When given an opportunity to speak in mitigation of his sentence, Hall apologized for his actions and expressed optimism about getting out of jail and

restarting his life. (ECF No. 61 at 20).

Based in part upon the seriousness of the instant offense, the Court sentenced Hall to 3 years imprisonment, to run consecutive to the state sentence that he was then serving, as well as 3 years of supervised release. (*Id.* at 21). The Court further directed a $100 special assessment to be paid out of Hall's prison earning at a rate of $10 per month until paid in full, but declined to impose any additional fines, restitution, or costs in light of his limited earning capacity. (*Id.* at 22).

On September 29, 2010, Hall filed a notice of appeal to the United States Court of Appeals for the Fourth Circuit Court ('Fourth Circuit"), contesting the sentence imposed. (ECF No. 53). On March 15, 2011, the Fourth Circuit held that Hall's waiver of appellate rights was made knowingly and voluntarily; accordingly, the waiver precluded review of the sentence and Hall's appeal was dismissed. (ECF No. 63).

On March 9, 2012, Hall timely filed the present action seeking to set aside his conviction. (ECF No. 68).[3]

## II. <u>Movant's Grounds for Vacating, Setting Aside, or Correcting His Sentence.</u>

Hall states the following grounds in support of his § 2255 Motion:

1. His guilty plea was not knowing and voluntary. Hall argues that his plea was involuntary because he was under the influence of a prescribed mind-altering medication, "Celexa," and did not understand the consequences of his plea. (ECF No. 68 at 8, 14).

2. He received ineffective assistance of counsel. Hall complains that his counsel (a) failed to address his mental competency issues; (b) misrepresented Hall's possible sentence, first by stating that he would likely receive probation only, and then by stating that his sentence would run concurrently with his ongoing state sentence; and (c)

---

[3] Although Hall's § 2255 Motion reflects a filing date of April 10, 2012, (ECF No. 68 at 1), it was signed by Hall on March 9, 2012, (ECF No. 68 at 13), while the envelope in which it was received is post marked March 12, 2012. (ECF No. 67 at 4). Under the "mailbox rule," this action was timely filed. *See* <u>Houston v. Lack</u>, 487 U.S. 266 (1988).

instructed Hall to take full blame for the offense when he knew that others had participated. (*Id.* at 4, 14, 15).

3. Collateral Claims. Hall raises the following objections to his proceedings: (1) Improper use of an informer to convict. Hall alleges that his brother received sentencing leniency in exchange for testifying against him, (ECF No. 68 at 15); (2) Prosecutorial misconduct. Hall alleges that at the Grand Jury hearing, the prosecutor threatened to "take all [Hall's] good time if [he] did not testify," despite his request for an attorney, (ECF No. 68 at 15); and (3) Prejudicial pre-trial publicity. Hall asserts that case received massive media coverage, beginning long before he pleaded guilty, (*Id.* at 14).

4. Actual innocence. Hall states that he was incompetent at the time of the offense due to the influence of multiple substances, and that he therefore has no recollection as to whether he actually committed the offense. (*Id.* at 7, 14, 15).

## III.   **Standard Under 28 U.S.C. §2255**

A motion made pursuant to 28 U.S.C. § 2255 is a collateral attack on a conviction or sentence imposed in a separate proceeding. *Wall v. Kholi*, ___ U.S. ___, 131 S.Ct. 1278, 1284-85, 179 L.Ed.2d. 252 (2011). To succeed on such a motion, the movant must prove that the conviction or sentence was imposed in violation of the laws or Constitution of the United States; or the court imposing the sentence lacked jurisdiction; or the sentence exceeded the maximum authorized by law; or the sentence was otherwise subject to collateral attack. 28 U.S.C. § 2255. Because a § 2255 motion seeks to deny, evade, or impeach a judgment, claims of error that have previously been raised and rejected on a direct appeal of the judgment may not be raised again in a § 2255 motion. *United States v. Harrison*, 123 F.3d 701, 1997 WL 499671, at *1 (4th Cir. Aug. 25, 1997) (unpublished).

Nonetheless, a § 2255 motion is not an alternative to filing a direct appeal. *United States v. Frady,* 456 U.S. 152, 165, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Nonconstitutional claims that *could* have been raised on direct appeal, but were not,

may not be asserted in collateral proceedings. *Stone v. Powell*, 428 U.S. 465, 477, n.10, 96 S.Ct. 3037, 49 L.Ed2d 1067 (1976) (citing *Davis v. United States*, 417 U.S. 333, 345-346 and n.15 (1974); *Sunal v. Large*, 332 U.S. 174, 178–79 (1947)); *see also United States v. Linder*, 552 F.3d 391, 396–97 (4th Cir. 2009) ("Where the petitioner only waives the right to appeal, he is not precluded from filing a petition for collateral review. But he is precluded from raising claims that are the sort that *could have* been raised on appeal.") (quoting Brian R. Means, *Fed. Habeas Practitioner Guide,* Jurisdiction ¶ 1.23.0 (2006/2007)) (emphasis in the original) (internal citations omitted). Nonconstitutional claims that *could not* have been asserted on direct appeal may be raised in a § 2255 motion only if the alleged error constituted "a fundamental defect which inherently results in a complete miscarriage of justice" *Stone*, 428 U.S. at 477 n.10 (quoting *Davis*, 417 U.S. at 346; *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962)) or is "inconsistent with the rudimentary demands of fair procedure." *United States v. Timmreck*, 441 U.S. 780, 784, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979).

Similarly, a constitutional error that could have been, but was not raised on appeal may not be raised for the first time in a § 2255 motion, unless the movant can show either (1) "cause" that excuses the failure to raise the error on appeal and "actual prejudice" resulting from the error, or (2) that a miscarriage of justice would occur if the court refuses to entertain the collateral attack. *Massaro v. United States*, 538 U.S. 500, 504, 123 S.Ct. 1690, 155 L.Ed. 2d 714 (2003) (citing *Bousley v. United States*, 523 U.S. 614, 621–22, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998)); *Frady,* 456 U.S. *at* 167–68; *United States v. Mikalajunas,* 186 F.3d 490, 492–93 (4th Cir. 1999). To establish "actual prejudice," the movant must show that the alleged error resulted in an "actual

and substantial disadvantage," rather than a mere possibility of prejudice. *Satcher v. Pruett,* 126 F.3d 561, 572 (4th Cir. 1997) (quoting *Murray v. Carrier,* 477 U.S. 478, 494, 106 S.Ct. 2639, 2648 (1986)). To demonstrate a miscarriage of justice, the movant must prove "actual innocence" of the crime for which he was convicted, substantiating that "it is more likely than not, in light of all the evidence, that no reasonable juror would have convicted him." *Bousley,* 523 U.S. at 623 (quoting *Schlup v. Delo,* 513 U.S. 298, 327-28, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)).

A guilty plea further diminishes the scope of potential claims available under § 2255. A voluntary and intelligent guilty plea amounts to an admission of the material elements of the charged crime, *McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969); consequently, it constitutes a waiver of *all claims* relating to non-jurisdictional errors that occurred prior to the plea, including claims relating to alleged constitutional deprivations. *United States v. Moussaoui,* 591 F.3d 263, 279 (4th Cir. 2010); *Tollett v. Henderson,* 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973)). "Thus where a defendant does not challenge the jurisdiction of the court's 'power to enter the conviction or impose the sentence,' 'the [§ 2255] inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary.'" *United States. v. Fabian*, 798 F.Supp.2d 647, 669 (D. Md. 2011) (quoting *United States v. Broce,* 488 U.S. 563, 569, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989)); *See also Tollett*, 411 U.S. at 266 (In the context of a guilty plea, the "focus of federal habeas inquiry is the nature of the advice and the voluntariness of the plea not the existence as such of an antecedent constitutional infirmity.")*.*

Under the Rules Governing Section 2255 Proceedings, the reviewing court must examine the motion, answer, any transcripts and record of prior proceedings, and any

other materials supplied by the parties to determine the need for an evidentiary hearing. If the motion can be resolved based on the record before the court, an evidentiary hearing is unnecessary. *Raines,* 423 F.2d at 529. With this framework in mind, the undersigned examines each of Hall's allegations.

IV.   <u>**Analysis**</u>

   A.   **Competence to Enter Guilty Plea**

Hall alleges that he was not competent to enter a guilty plea because he was "under the use of the drug 'Celexa' and unable to understand the proceedings." (ECF No. 68 at 14). A criminal defendant's guilty plea is only constitutionally valid "to the extent it is voluntary and intelligent." *Bousley*, 523 U.S. at 618. Thus, before accepting a guilty plea, the Court must determine that the defendant is competent to enter the plea, and that his plea is knowing and voluntary. *Godinez v. Moran*, 509 U.S. 389, 400, 113 S. Ct. 2680, 125 L.Ed.2d 321 (1993).

The Rule 11 colloquy is designed to ensure that the guilty plea is both intelligent and voluntary. *See United States v. Vonn,* 535 U.S. 55, 58, 122 S.Ct. 1043, 152 L.Ed.2d 90 (2002); *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed2d 747 (1970). When accepting a guilty plea, the court must address the defendant personally in open court and inform him of the rights that he is waiving by changing his plea to guilty. *Fed. R. Crim. P.* 11(b). Thus, "[p]rior to accepting a guilty plea, a trial court, through colloquy with the defendant, must inform the defendant of, and determine that he understands, the nature of the charge(s) to which the plea is offered, any mandatory minimum penalty, and the maximum possible penalty and various rights." *United States v. DeFusco,* 949 F.2d 114, 116 (4th Cir. 1991) (citing *Fed. R. Crim. P.* 11(c)(1)). The court also must determine whether there is a factual basis for the plea and ensure that the plea

did not result from force, threats, or non-plea agreement promises. *Id.* at 120. If the defendant fails to understand his constitutional protections and the charges made against him, the guilty plea is invalid and should not be accepted. *Henderson v. Morgan,* 426 U.S. 637, 645, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976).

The standard for determining a defendant's competence to enter a guilty plea is the same as the standard for determining competency to stand trial. *Godinez*, 509 U.S. at 397-99. The defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Id.* at 396 (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)); *United States v. Johnson*, 490 Fed Appx. 566, 567 (4th Cir. Aug. 3, 2012). "Not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." *Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000). Accordingly, "the fact that the petitioner has been treated with [psychotropic medications] does not *per se* render him incompetent to stand trial." *United States v. Hebron*, 442 Fed. Appx. 887, 889-90 (4th Cir. 2011) (quoting *Burket*, 208 F.3d at 192). Instead, in order "[f]or medication to render a defendant incompetent, the medication must have so impaired his mental faculties that he was 'incapable of full understanding and appreciation of the charges against him, of comprehending his constitutional rights, and of realizing the consequences of his plea.'" *United States v. Nicholson*, 676 F.3d 376, 382 (4th Cir. 2012) (quoting *United States v. Damon*, 191 F.3d 561, 565 (4th Cir. 1999)) (internal quotations omitted). Claims of incompetence "can raise issues of both procedural and substantive due process." *Burket*, 208 F.3d at 192.

### 1. Procedural Competency Claim

Under a procedural competency claim, the relevant issue is whether "the trial court failed to hold a competency hearing after the defendant's mental competency was put in issue." *Id.* at 192; *see also Godinez*, 509 U.S. at 408 ("Trial courts have the obligation of conducting a hearing whenever there is sufficient doubt concerning a defendant's competence."). The Fourth Circuit has held that when a criminal defendant informs the district court at a Rule 11 hearing that he is under the influence of medication, the district court should "inquire about what effect, if any [the defendant's] medication ha[s] on his ability to make a voluntary plea and to understand the consequences." *Damon*, 191 F.3d at 565; *see also Nicholson*, 676 F.3d at 382-83. Nevertheless, there is no mandatory method by which to conduct the Rule 11 colloquy; instead, "[t]he manner of ensuring that the defendant is properly informed is committed to the good judgment of the district court, to its calculation of the relative difficulty of comprehension of the charges and of the defendant's sophistication and intelligence." *United States v. Reckmeyer,* 786 F.2d 1216, 1221 (4th Cir. 1986) (*citing United States v. Dayton,* 604 F.2d 931, 938 & n. 11 (5th Cir.1979) (en banc)). The trial court need only inquire into a criminal defendant's competence when a response in a plea colloquy raises a red flag as to his competence to plead guilty. *Nicholson*, 676 F.3d at 383 (holding that defendant was not entitled to a competency hearing despite admitting to having taken "pain pills" during the past 24 hours, because his answers to the trial court's follow-up questions raised no red flags); *United States v. Shiflett*, 258 Fed. Appx. 560, 563 (4th Cir. 2007) ("[N]one of the answers provided by [defendant] or his counsel raised any 'red flags' regarding adverse effects on his mental state that may have resulted from the prior use of medication."); *but see Damon*, 191 F.3d at 565 (holding

that the defendant's admission that "he was 'currently' under the influence of antidepressant medication," combined with his lawyer's statements that "he thought the name of the drug was Elantin 'or something of that nature" and that "'impaired judgment' was listed as a side effect," should have raised a red flag for the district court regarding the defendant's competence to plead guilty).

Here, the presiding district judge specifically addressed Hall's mental health at the Rule 11 hearing, repeatedly verifying that he understood the nature of the proceedings and the consequences of his guilty plea. The Court asked Hall whether he had ever received psychiatric or mental health treatment, to which Hall responded that he had been treated for approximately two years after he lost custody of his children. (ECF No. 60 at 7-8). Hall confirmed that this treatment concluded in 2006 or 2007 and he had gotten over the problem he was having at the time. (*Id.* at 8). The Court inquired whether Hall had taken any medication over the previous 48 hours, to which Hall responded that he had taken Celexa. (*Id.*). In follow-up, the Court queried Hall regarding the nature of Celexa and the dosage he took. Hall explained that Celexa was a medication for depression and he had been taking 60 milligrams daily since entering the Mount Olive Correctional Complex three months earlier. (*Id.*). The Court verified from Hall that this medication was prescribed by a psychiatrist and that the dosage had remained the same throughout the three-month period of his incarceration.[4] (*Id.*). Significantly, neither Hall nor his counsel suggested that Celexa in any way impaired Hall's mental faculties. Likewise, nothing about Hall's behavior or testimony during the Rule 11 hearing suggested that he was anything other than competent. See *Beck v. Angelone*, 261 F.3d 377, 387 ("Although there are no fixed or immutable signs which

---

[4] According to medical report, Hall was receiving 90 milligrams of Celexa at the time of evaluation. (ECF No. 85-1 at 3). Therefore, Hall's dosage had actually been reduced by the time of the plea hearing.

invariably indicate the need for further inquiry to determine fitness to proceed proof of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant.") (internal quotations omitted). Throughout the plea hearing, the Court consistently sought and received confirmation from Hall that he understood the elements of the charge to which he was pleading; the provisions contained in the plea agreement; the sentence and penalties he exposed himself to by pleading guilty; the purpose and effect of the advisory sentencing guidelines; and the consequences of pleading guilty including the rights he would be waiving. Simply put, Hall's statements during the Rule 11 colloquy did not raise any red flags to suggest to the Court that Hall "under the influence" of medication or incompetent to enter a guilty plea.

Assuming for argument's sake that the Court erred by not probing further into the effects of Celexa on Hall's mental state, Hall's motion still must fail in light of the evidence of record, which unequivocally verifies that Hall was competent. "[T]he usual remedy for a Rule 11 violation involving a question of competence or voluntariness is to vacate the defendant's guilty plea." *Damon*, 191 F.3d at 565. Nonetheless, in *Damon*, the Fourth Circuit confirmed that before taking such action, the appellate court should consider whether the district court's violation constituted harmless error. *Damon*, 191 F.3d at 566; *see also Nicholson*, 676 F.3d at 328; *United States v. Watson*, 319 Fed. Appx. 226, 227 (4th Cir. 2009). "[An appellate] court may vacate a conviction made pursuant to a plea 'only if the trial court's violations of Rule 11 affected the defendant's substantial rights.'" *United States v. Goins*, 51 F.3d 400, 402 (4th Cir.1995) (quoting *United States v. DeFusco*, 949 F.2d 114, 117 (4th Cir.1991)). Thus, if evidence existing at the time of the guilty plea establishes that Hall was competent despite taking Celexa, his

motion to vacate is without merit even if the district court's investigation was inadequate.

Fortunately, in this case, the court need not undertake a retrospective evaluation of Hall's competency at the time of his guilty plea, *see e.g. United States v. Wearing,* 2011 WL 918343 (W.D.Va. Mar. 15, 2011), or conduct an assessment of the predicted effects of Celexa on Hall's judgment using objective medical and scientific information. *Damon*, 191 F.3d at 565. Instead, the undersigned has the benefit of a contemporaneous forensic psychological examination, which plainly demonstrates that Hall was fully competent to stand trial or plead guilty even while using Celexa. (ECF No. 85-1). In March 2010, less than two months before the plea hearing and *one month after* Hall began taking Celexa, Stephen F. Dreyer, Ph.D. conducted a forensic mental health examination of Hall at the request of the Office of the Federal Public Defender. (ECF Nos. 79 at 1, 85-1). Counsel referred Hall for the evaluation out of "concern regarding competency at the time of the current evaluation" because "while incarcerated [Hall] has been reportedly depressed and made suicide gestures." (ECF No. 85-1 at 2). At the time of the evaluation, Hall was taking 90 mg. of Celexa daily. (*Id.* at 3).

After conducting an in-person interview, followed by a series of objective psychological tests, Dr. Dreyer ultimately concluded that Hall "does not present with evidence of a mental disease or defect to the extent that he lacked substantial capacity to either appreciate the wrongfulness of his conduct or to conform his behavior to the requirements of the law in conjunction with the federal criminal charges now pending against him." (*Id.* at 8). Dr. Dreyer also observed that "there is no evidence of mental disease or defect that, at the present time, would prevent Mr. Hall from being able to consult with his attorney with a reasonable degree of rational understanding of the

nature of the proceedings against him," and noted that Hall "demonstrated an understanding of the charges lodged against him and appreciates the consequences of those charges." (*Id.*). Moreover, Dr. Dreyer opined that in fact "Mr. Hall attempted to exaggerate and/or malinger cognitive deficits and emotional impairment." (*Id.*).

Dr. Dreyer made the following observations which further corroborate Hall's competence at the time he entered his guilty plea. First, Dr. Dreyer commented that Hall was interviewed while in the Segregation Unit under "no contact" restrictions. (ECF No. 85-1 at 4). When questioned about it, Hall explained to Dr. Dreyer that he was afraid of being placed in the General Population; therefore, he sought out advice "on how to get put on Seq." He followed suggestions supplied by his cell mate and was rewarded with separation from the rest of the prison population. (*Id.*). Hall added, "I hope I can be found incompetent so that maybe I could be sent to a mental health unit or something like that. Either way I am going to [do] all that I can to stay on Seq. and try to survive the next four years or so. I got one year credit so far with a five to fifteen year sentence so I am hoping [that] maybe I can get out in four years or so, particularly if these federal charges can be run concurrently." (*Id.*) Dr. Dreyer noted that "Hall demonstrated a general knowledge and understanding of the state and federal charges against him, the issues of competency, and plea bargaining." (*Id.*). Second, Hall claimed that he "consistently hears the voice of his deceased sister 'screaming and telling [him] to kill [him]self and other people.'" (*Id.* at 5). However, Dr. Dreyer noted that "several aspects of his claim of hearing his sister's screaming voice lacked veracity," and that "during the interview, he was able to understand and appropriately respond to all questions from the psychological examiner with no distractions being demonstrated, no thought intrusions being expressed, even when the examiner purposely decreased the volume of

his voice" so as to test Hall's claims regarding the volume of the screaming. (*Id.*).

Accordingly, Dr. Dreyer opined that Hall's "complaint of hearing his sister's voice is

either extremely exaggerated or malingered." (*Id.*). Third, Dr. Dreyer took note of Hall's

"acknowledged 'suicide attempts' while in the regional jail," which "primarily consist[ed]

of cutting on his wrists." (ECF No. 85-1 at 6). Hall denied suicidal ideations at the time

of the evaluation, but told Dr. Dreyer that "if I need to get suicidal to be safe or be put in

a mental health unit, I could happen, but I don't like to do that because they take away

all your stuff, put you in a nightgown, and look at you all the time, it's really not worth

it." (*Id.*). Dr. Dreyer observed that "such a response is much more consistent with

manipulative gesturing as opposed to actual suicidal threat." (*Id.*). Fourth, in all three

validity measure tests, Hall's performance strongly correlated with symptom

exaggeration and malingering. (ECF No. 85-1 at 6-7). Consequently, there was "a high

probability that findings on concurrently administered psychological tests are invalid

reflections of current capacities." Fifth, Dr. Dreyer observed that Hall's scores on various

cognitive measure and competency tests were drastically lower than the scores he had

received just two years prior on the same tests during the course of a 2008 competency

evaluation relating to his underlying state offense. (*Id.* at 7-8). In particular, on the

Georgia Court Competency Test, Hall claimed "not knowing what the judge does during

the trial; what the jury would do; what the prosecuting attorney would do; and

incorrectly labeled the courtroom setting, including such things where the judge would

sit, where the jury would sit, where the prosecuting attorney would sit," in spite of

responding with 100% accuracy on the same test in 2008 and "in spite of the fact that he

was recently in a courtroom setting." (*Id.* at 8). Dr. Dreyer concluded that Hall had

"feigned an inability to accurately depict and label a typical courtroom setting and not

understand the functions of the various courtroom participants." (*Id.*).

Consequently, this court has before it unchallenged evidence of Hall's competency when taking Celexa. Hall's March 2010 evaluation involved both thorough objective testing and expert assessment by a licensed mental health provider, factors which bolster the validity of the ultimate findings. *United States v. General*, 278 F.3d 389 (4th Cir. 2002) (internal quotations omitted). ("Medical opinions are usually persuasive evidence on the question of whether a sufficient doubt exists as to the defendant's competence to require a competency hearing.") Nothing in the record indicates that Hall experienced any change in condition during the interim between the competency evaluation and the guilty plea. Similarly, nothing in the record contradicts Dr. Dreyer's conclusions except for Movant's self-serving and unsubstantiated allegation that he 'did not understand what the consequences would be [of his guilty plea]." Therefore, the undersigned **FINDS** Movant's claims related to procedural competency are without merit.[5]

### 2. Substantive Competency Claim

Under a substantive competency claim, the petitioner alleges "that he was, in fact, tried and convicted while mentally incompetent." *Beck*, 261 F.3d at 387-88 (internal quotations omitted). "A petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his incompetency by a preponderance of the evidence." *Id.* at 388. As discussed above, there is simply no

---

[5] The undersigned notes that included in Hall's mental health records were two additional evaluations of Hall's competency to stand trial and/or assist his attorney in his own defense, which were conducted by mental health care providers other than Dr. Dreyer; one was performed in 2008 and one in 2006. (ECF Nos. 85-2, 85-3). Like Dr. Dreyer, these evaluators found Hall to be mentally competent with a good understanding of the legal system, but a predisposition to manipulation.

evidence on the record, let alone a preponderance, to support Hall's claim of incompetency. To the contrary, the record of the Rule 11 hearing reflects a thorough Rule 11 colloquy, during which the presiding district judge appropriately probed Hall's mental status and then fully advised him of the nature of the charge against him, the mandatory minimum and maximum penalties, the constitutional and civil rights lost by entering a guilty plea, and the effect and consequences associated with the plea agreement and Stipulation of Facts. Moreover, "[t]hroughout this colloquy, the district judge had an opportunity to observe [petitioner's] demeanor and tone in response to these questions before deciding to accept [his] plea as knowing and voluntary." *See Hebron*, 442 Fed. Appx. at 890 (rejecting a petitioner's substantive competency claim based upon her conduct during the Rule 11 plea colloquy). As discussed above, the March 2010 psychological evaluation conducted at the request of Hall's counsel conclusively demonstrates that Hall was fully competent to enter his guilty plea. *See supra* Part IV.A.1.

Considering Dr. Dreyer's evaluation and Hall's testimony and behavior during the Rule 11 hearing, it is clear that Hall's use of Celexa did not render him incompetent at the time he pled guilty. Moreover, Hall acknowledged his understanding of the consequences of his guilty plea and affirmed that his decision to plead guilty was made freely, voluntarily, and after due consideration. Accordingly, the undersigned **FINDS** that (1) the district court conducted an adequate investigation into Hall's competency; (2) Hall was competent to plead guilty at the time of his Rule 11 hearing, and (3) his guilty plea was voluntary and intelligent.[6]

---

[6] As the United States points out, the Fourth Circuit implicitly reached this conclusion on direct appeal when it found Hall's waiver of appellate rights to have been made knowingly and voluntarily.

### B.     Ineffective Assistance of Counsel

Hall argues that trial counsel provided ineffective assistance by: (1) failing to address his mental competency issues; (2) falsely promising Hall that his sentence would run concurrently with his ongoing state sentence; and (3) instructing Hall to take full blame for the offense despite knowing that other individuals had participated in the offense. (ECF No. 68 at 4). Hall also alleges that his attorney told him that he did not have the right to appeal. (*Id.* at 14). The undersigned addresses each objection in turn.

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to effective assistance of counsel during critical stages of criminal proceedings, *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), including plea-bargaining, *Lafler v. Cooper*, ___U.S.___, 132 S. Ct. 1376, 1384-86, 182 L.Ed.2d 398 (2012), and direct appeal. *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). While assistance "which is ineffective in preserving fairness does not meet the constitutional mandate," *Strickland,* 466 U.S. at 685-86, "defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation." *Mickens v. Taylor,* 535 U.S. 162, 166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2001).

Under *Strickland*, a defendant can prove ineffective assistance of counsel by meeting the requirements of a two-prong test. The defendant carries the burden of satisfying both prongs of the test, and "a failure of proof on either prong ends the matter." *United States v. Roane,* 378 F.3d 382, 404 (4th Cir. 1994). First, the defendant must show that counsel's representation fell below an objective standard of reasonableness. When evaluating counsel's performance under the first prong of *Strickland,* "judicial scrutiny of counsel's performance must be highly deferential."

*Strickland*, 466 U.S. at 689. Thus, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted). The inquiry under Strickland is "whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington v. Richter,* ___ U.S. ___. 131 S.Ct. 770, 778 , 178 L.Ed.2d 624 (2011).

The second prong of the *Strickland* test requires the defendant to affirmatively establish prejudice; that is, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 687-91. In the context of a guilty plea, the prejudice prong of *Strickland* requires the defendant to demonstrate that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59. In the context of an appeal, the defendant must demonstrate a reasonable probability that, but for his counsel's failure to raise a particular issue, he would have prevailed on the appeal. *Smith v. Robbins*, 528 U.S. 259, 285-86, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000).

Hall argues that trial counsel "knew that [he] was on mind altering drugs, prescribed by the jail." (ECF No. 68 at 4). Hall also claims that he "had a mental breakdown, and had been on suicide watch for months." (*Id.*) In support of his claim of incompetence, Hall further asserts "that [his] state attorney felt strongly enough about [his] condition to have [him] sign legal power of attorney over to [his] wife due to [his] inability to grasp what was happening," though he does not specify a relevant time period. (*Id.*). Accordingly, Hall argues that trial counsel provided ineffective assistance

by failing to appropriately address his competency issues. (*Id.*)

This argument is unavailing because Hall's trial counsel clearly considered Hall's mental competency and referred him for a forensic mental health examination in March 2010.[7] (ECF Nos. 79, 85-1). As discussed above, Dr. Dreyer opined that Hall was competent to stand trial and could consult with counsel with a reasonable degree of rational understanding of the charges and proceedings against him. (ECF No. 85-1). Nothing in the record suggests that Hall suffered a demonstrable deterioration of mental stability in the two months between the evaluation and the Rule 11 hearing. Thus, counsel was not ineffective by failing to request a competency evaluation at the time of the plea hearing. Hall fails to explain what counsel should have done differently, and the undersigned discerns no evidence of error or deficient performance.

Hall also argues that he only pleaded guilty because his attorney incorrectly informed him that his federal sentence would run concurrently with his ongoing state sentence. (ECF No. 68 at 5, 15). Instead, the district court ordered Hall's sentence to run consecutively following completion of his state sentence. (ECF No. 61 at 24). Hall therefore argues that trial counsel provided ineffective assistance by misadvising him regarding his potential sentence. (*Id.* at 5). In order to demonstrate ineffective assistance of counsel based upon erroneous advice that leads to an involuntary guilty plea, the defendant must prove: "(1) that counsel's errors were below a standard of reasonable competence, and (2) that but for those errors, the defendant would not have pleaded guilty, but would have instead proceeded to trial. *United States v. Roberts*, 426 Fed. Appx. 195, 196 (4th Cir. 2011) (restating *Hill*, 474 U.S. at 59). With respect to

---

[7] It is also significant to note that Hall's counsel took the extra step of obtaining copies of Hall's pre-existing mental health care records, (ECF Nos. 85, 85-1 through 85-10), and these records substantiated Dr. Dreyer's assessment. (ECF Nos. 85-2, 85-3).

incorrect sentencing advice, the Fourth Circuit has held that "if the information given by the court at the Rule 11 hearing corrects or clarifies the earlier erroneous information given by the defendant's attorney and the defendant admits to understanding the court's advice, the criminal justice system must be able to rely on the subsequent dialogue between the court and defendant." *United States v. Foster*, 68 F.3d 86, 88 (4th Cir. 1995) (finding no prejudice where district court cured counsel's purported misadvice regarding sentencing); *see also United States v. Ellerby*, 2012 WL 3108616, at *2 (4th Cir. Aug. 1, 2012) (same).

Even if the court were to accept that trial counsel incorrectly advised Hall about his sentence running concurrently,[8] and that such misadvice fell below an objective standard of care, *but see United States v. Lambey*, 974 F.2d 1389, 1395-96 (4th Cir. 1992) ("Other than the significant discrepancy between the sentencing range estimated by [counsel's] attorney and the range actually applied, however, the record reveals no evidence of incompetence"), Hall cannot demonstrate prejudice under the second prong of *Strickland* in light of the District Court's admonishments during his Rule 11 colloquy. During the plea hearing, the District Court reminded Hall that he exposed himself to a maximum penalty of five years imprisonment by virtue of his guilty plea, which Hall stated that he understood. (ECF No. 60 at 13). Furthermore, the Court alerted Hall that

---

[8] The undersigned regards this claim as dubious, as there is no evidence beyond Hall's own unsupported statements that counsel misadvised him. Hall's trial counsel provided a sworn statement asserting that he never lied to or promised Hall that his sentence would run concurrently. (ECF No. 79 at 1). Trial counsel states that he discussed the language of U.S.S.G. § 5G1.3 with Hall and told him that he would argue in favor of a concurrent sentence. (*Id.*). This is consistent with the record of Hall's sentencing hearing, in which counsel urged the Court to consider a partially concurrent sentence pursuant to § 5G1.3(c). (ECF No. 61 at 17). Additionally, during his March 2010 psychological evaluation, Hall stated to Dr. Dreyer, that "I got one year credit so far with a five to fifteen year sentence so I am hoping [that] maybe I can get out in four years or so, particularly *if* these federal charges can be run concurrently."(emphasis added) (ECF No. 85-1 at 4). This and other statements made by Hall during the psychological evaluation suggest that he fully understood the potential of his federal sentence running consecutively to his state sentence.

his sentence was subject to the Court's discretion. (*Id.* at 20-21, 29-30). After explaining the purpose of the sentencing guidelines, the Court reminded Hall that it "is not bound by that advisory guideline range because it is advisory," which Hall stated that he understood. (*Id.* at 21). Later, the Court addressed Hall's future sentencing in further detail, stating:

> Now then, I noted to you earlier the sentencings *[sic]* guidelines and I think you are familiar with that. What I want to do now is to tell you one other thing about them, and it is this. There isn't anyone right now that can tell you exactly where your United States advisory sentencing guidelines will fall -- not your attorney, nor the attorney for the government, nor the court. That is not going to become clear until after the probation department has made its presentence investigation in the case and has filed its report, and the parties have had a chance to go over it and object to it and try to work those objections out. And to the extent objections remain, the court will pass upon them at sentencing, and at sentencing, the court may raise matters of its own, including those very same things the parties had already tried to work out by agreement.
>
> And so, until we reach the point where the court has passed on all those matters at sentencing, it will not become clear exactly where your advisory guideline range will fall.
>
> Do you understand that?

(*Id.* at 29). Hall confirmed that he understood the Court. (*Id.*). Additionally, the Court specifically asked Hall if he had "been made any promises by anyone of leniency or light sentence or probation" outside of the written plea agreement, to which Hall responded that he had not. (*Id.* at 30). Hall further affirmed that the written plea agreement was the entire agreement between him and the United States and that there were no side agreements of any kind. (ECF No. 60 at 31). Finally, Hall asserted that his guilty plea was offered voluntarily and of his own free will. (*Id.*). Because the "the trial court properly informed [defendant] of the potential sentence he faced, he could not be prejudiced by any misinformation his counsel allegedly provided him." *Foster*, 68 F.3d at 88. Hall's attempts to argue that he was "promised probation, then concurrent

sentence," (ECF No. 68 at 14), is foreclosed in light of his sworn statements made during the Rule 11 hearing. *See Lemaster*, 403 F.3d at 221-22 ("[I]n the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements."). The fact that Hall received a more severe sentence than he hoped for is not grounds to vacate, amend, or alter his sentence.

Next, Hall claims that his attorney "instructed [him] in a letter not to place the blame anywhere else" and that his attorney "stated he knew others participated, but for [Hall] to take full blame so [he] could get exceptance *[sic]* of responsibility." (ECF No. 68). Hall's trial counsel provided a copy of the letter to which Hall refers. (ECF No. 79). In the letter, trial counsel instructed Hall in relevant part that:

> Judge Copenhaver also will ask you to describe in your own words what you did to be guilty of the charges. It is important that you show the Judge that you realize what you did was wrong. You should tell the judge about your role in mailing the threatening letter. You should **not** put blame on anyone else. One of the factors that Judge Copenhaver will consider in determining your sentence is whether you have accepted responsibility for your offense. (I know that others participated in the offense. I will talk about that at sentencing.)

(*Id.* at 4, emphasis in original). Hall's counsel elaborated in a sworn affidavit that "in some of [his] discussions with Mr. Hall, he shifted blame for the offense from himself to others in ways which were contradicted by the discovery received to a degree that [counsel] feared he would put the offense level reduction for acceptance of responsibility in jeopardy." (*Id.* at 2). Accordingly, counsel "saw no benefit to litigating these factual disputes when [Hall] was admitting to guilt; that is, there would be little, if any, benefit from winning a contested hearing at sentencing and a substantial detriment if we lost." (*Id.*). At the sentencing hearing, Hall's counsel both argued in support of Hall's version

of the offense, in which he alleged that another individual participated by typing the letters at Hall's direction, (ECF No. 61 at 4), as well as argued in favor of a reduction in total offense level, based upon his acceptance of responsibility. (*Id.* at 6). Significantly, the Court both accepted Hall's version of his conduct, (*Id.* at 5), and, nevertheless, granted Hall a three-level reduction in his total offense level for his acceptance of responsibility. (*Id.* at 15). Hall has clearly failed to demonstrate that counsel's strategy to have him plead and accept responsibility for his actions was unsound. *See Strickland*, 466 U.S. at 689. The undersigned observes that Hall appears to have benefited doubly from his counsel's representation, in that counsel alerted the court to Hall's contention that others participated in the offense, but also managed to secure a three-level reduction of Hall's total offense level. (ECF No. 61 at 15). Hall will not be heard to complain about counsel's performance, particularly as he fails to explain what counsel should have done differently or how it would have improved the outcome of his case.

Finally, Hall alleges that his attorney told him he did not have the right to appeal. (ECF No. 68 at 14). "The Sixth Amendment right to counsel extends to the direct appeal and it obligates the attorney to file the appeal and identify possible issues for the court even if, in the attorney's opinion, those issues are not meritorious." *United States v. Peak*, 992 F.2d 39, 41 (4th Cir. 1993) (internal citation omitted) (citing *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967)). However, "appellate counsel is not required to raise every colorable claim on appeal: rather, winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy." *Jones v. Catoe*, 9 Fed. Appx. 245, 254 (4th Cir. 2001) (quoting *Smith v. Murray*, 477 U.S. at 536) (internal quotation marks omitted). In the instant case, counsel denies advising Hall that he could not appeal, but clarifies that he

"did explain the appeal waiver provisions in the plea agreement," and "did tell [Hall] that [he] thought the appeal waiver would be enforced and any appeal would be dismissed under the terms of the waiver," and "did review and explain the provisions of the appeal waiver which preserves his right to attack the validity of his plea on the grounds of ineffective assistance of counsel." (ECF No. 79 at 2). At any rate, the record reflects that Hall's counsel and the Federal Public Defender's Office did, in fact, file an appeal on Hall's behalf, which included an argument that the appeal waiver provision of Hall's plea agreement was inapplicable. (ECF No. 53). After reviewing the plea agreement and transcript of the Rule 11 hearing, the Fourth Circuit concluded that "Hall knowingly and voluntarily waived his right to appeal and that the issue Hall seeks to raise on appeal falls squarely within the compass of his waive of appellate rights." (ECF No. 63). Accordingly, Hall's appeal was dismissed. (*Id.).* Hall's claim of ineffective assistance on appeal is therefore conclusively defeated by the fact Hall actually did appeal his case to the Fourth Circuit.

Accordingly, the undersigned **FINDS** that Hall did not receive ineffective assistance of counsel.

### C.    Collateral Claims

Hall raises the following additional objections relating to the course of his criminal proceedings: (1) Improper use of informer to convict; (2) Prosecutorial misconduct; and (3) Prejudicial pre-trial publicity. (ECF No. 68 at 14-15). All three of these claims are foreclosed from review because (1) as previously discussed, Hall entered into a voluntary and knowing guilty plea, which effectively waived these types of claims and (2) he knowingly and voluntarily waived his right to raise a collateral challenge to his conviction and sentence, except on the ground of ineffective assistance

of counsel. (ECF Nos. 34 at 6; 60 at 21-22).

A voluntary and intelligent guilty plea amounts to an admission of the material elements of the charged crime, *McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969); consequently, it constitutes a waiver of *all claims* relating to non-jurisdictional errors that occurred prior to the plea, including claims relating to alleged constitutional deprivations. *United States v. Moussaoui,* 591 F.3d 263, 279 (4th Cir. 2010); *Tollett v. Henderson,* 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973)). In addition, a criminal defendant may waive his right to attack his conviction and sentence collaterally, so long as the waiver is knowing and voluntary. *Lemaster*, 403 F.3d at 220.[9] Hall's written plea agreement contained a detailed waiver of appeal and collateral attack, including the following provision, "Mr. Hall . . . knowingly and voluntarily waives the right to challenge his guilty plea and his conviction resulting from this plea agreement, and any sentence imposed for the conviction, in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255." (ECF No. 34 at 6). Hall initialed each page of the plea agreement and signed the last page of the agreement, affirming that he had read and carefully discussed every part of the agreement with his attorney, and that he voluntarily agreed to the terms and conditions set forth in the agreement. (*Id.* 9). Moreover, at Hall's Rule 11 hearing, the Court explicitly reviewed the terms of the waiver of appeal and collateral attack rights contained in the plea agreement. (ECF No. 60 at 21-22). Hall in turn acknowledged that he understood the effect of the waiver provisions. (*Id.* at 22). Statements made during a hearing to accept a guilty plea are afforded a strong presumption of veracity and

---

[9] The Fourth Circuit has recognized a narrow class of claims that fall outside of the scope of a general waiver of collateral-attack rights, namely claims regarding complete deprivation of counsel and the imposition of a sentence in excess of the maximum penalty provided by statute or based on a constitutionally impermissible factor such as race. *Lemaster,* 403 F.3d at 220 n.2 (4th Cir. 2005). Hall's claims at issue here do not fall into either of these exceptions.

subsequent attacks that contradict these statements may generally be dismissed as frivolous. *Lemaster,* 403 F.3d at 221. "Absent clear and convincing evidence to the contrary, a defendant is bound by the representations he makes under oath during a plea colloquy." *Fields v. Attorney General of Md.*, 956 F.2d 1290, 1299 (4th Cir. 1992).

In light of the foregoing evidence, the undersigned **FINDS** that Hall's collateral claims were waived by his guilty plea and his waiver of collateral attack.

Furthermore, Hall's claims are otherwise without merit. First, Hall claims that the prosecution improperly used an informer to convict him, because his "brother received 6 months off his sentence for agreeing to" testify against him, despite the fact that Hall himself "turned in the evidence that convicted [his] brother." (*Id.*). Although the Fourth Circuit has "regularly reviewed trials in which paid government informants served as witnesses, considering such issues as paid informants' competency as witnesses, their credibility, the necessity for cautionary jury instructions regarding their credibility, and the disclosure of their status to the defense . . . [i]n none of the cases did [it] express any doubt about the legality of the practice." *United States v. Anty*, 203 F.3d 305, 310 (4th Cir. 2000). In fact, "no practice is more ingrained in our criminal justice system than the practice of the government calling a witness who is an accessory to the crime for which the defendant is charged and having that witness testify under a plea bargain that promises a reduced sentence." *United States v. Slaughter*, 1999 WL 236916, at *2 (4th Cir. Apr. 21, 1999) (quoting *United States v. Reid,* 19 F.Supp.2d 534, 537 (E.D.Va.1998)) "[G]ranting a witness lenient treatment in exchange for his testimony against a defendant is not improper." *United States v. Johnson*, 1995 WL 561302, at *1 (4th Cir. Sept. 22, 1995) (unpublished) (citing *United States v. Mitchell,* 886 F.2d 667, 670 (4th Cir.1989). The mere fact that that prosecution allegedly offered

Hall's brother a reduced sentence in exchange for testifying against him does not constitute grounds for vacating his conviction or sentence, particularly as Hall pleaded guilty to the offense independent of any testimony provided by his brother.

Second, Hall alleges prosecutorial misconduct on the ground that at his grand jury hearing, "the prosecutor threatened to take all [his] good time if [he] did not testify even though [he] asked for an attorney." (ECF No. 68 at 15). The test for reversible prosecutorial misconduct has two elements: "(1) whether the prosecutor's conduct was improper, and (2) whether such conduct prejudicially affected the defendant's substantial rights, depriving [him] of a fair trial." *United States v. Francisco*, 35 F.3d 116, 120 (4th Cir. 1994). The Sixth Amendment right to counsel does not attach until the initiation of adversary judicial proceeding against a defendant. *United States v. Bollin*, 264 F.3d 391, 414 (4th Cir. 2001) (quoting *United States v. Gouveia*, 467 U.S. 180, 187, 104 S. Ct. 2292, 81 L.Ed.2d 146 (1984). Adversarial judicial criminal proceedings include formal charge, preliminary hearing, indictment, information, or arraignment, but do not include grand jury proceedings. *See United States v. Kennedy*, 372 F.3d 686, 692 (4th Cir. 2004); *United States v. Ayala*, 601 F.3d 256, 272 (4th Cir. 2010). Accordingly, "a grand jury witness cannot insist, as a matter of constitutional right, on being represented by his counsel, even where the witness is a target of the investigation." *Kennedy*, 372 F.3d at 692 (quoting *In re Groban*, 352 U.S. 330, 333, 77 S.Ct. 510, 1 L.Ed.2d 376 (1957)) (internal quotations omitted). Accordingly, Hall fails to demonstrate either prong of the prosecutorial misconduct test.

Third, Hall attacks his conviction on the ground of prejudicial pre-trial publicity based upon his unsupported claim that "there was massive media coverage of this case accusing [him] long before [he] pled guilty." (ECF No. 68 at 14). The Sixth Amendment

protects a criminal defendant's right to a fair trial by impartial jurors. Accordingly, under certain circumstances pretrial publicity can prejudice a jury so as to deprive a criminal defendant of a fair trial. *In re South Carolina Press Ass'n*, 946 F.2d 1037, 1043 (4th Cir. 1991) (citing *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)); *see also Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Rideau v. Louisiana*, 373 U.S. 723, 726, 83 S.Ct. 1417, 10 L.Ed.2d. 663 (1963). However, "only in the most extreme circumstances may prejudice to a defendant's right to a fair trial be presumed from the existence of pretrial publicity itself." *United States v.* Jones, 200 Fed. Appx. 231, 232-33 (4th Cir. 2006); *United States v. Higgs*, 353 F.3d 281, 307-08 (4th Cir. 2003). In Hall's case, he knowingly and voluntarily pleaded guilty, thereby waiving his right to a trial by jury. (ECF No. 60). Although it is conceivable that pretrial publicity might effectively coerce a defendant into pleading guilty, *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 600 n.24, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), Hall does not make this argument in his petition, nor does the record contain even a scintilla of evidence to suggest that pretrial media coverage influenced Hall's decision to plead guilty to the offense. Accordingly, his argument must fail.

Consequently, the undersigned **FINDS** that Hall's collateral claims are meritless.

### D.     Actual Innocence

Hall's final ground for relief is based upon his claim that he is actually innocent of the charge to which he pled guilty. (ECF No. 68 at 14-15). In his petition, Hall alleges that he "was under the influence of drugs [and] alcohol, and ha[s] no reckolection *[sic]* of that night." (*Id.* at 14). Accordingly, Hall claims to "have no idea if [he] actually committed the crime." He further states that "my wife, nephews told me I didn't do it. But changed there *[sic]* statements later after my wife filed for divorce." (*Id.* at 15*).*

To sustain a claim of actual innocence, Hall must produce clear and convincing evidence that his guilty plea "has probably resulted in the conviction of one who is actually innocent." *Bousley,* 523 U.S. at 623–24. To the extent that his claim of innocence rests on allegations that directly contradict sworn statements made during a properly conducted Rule 11 colloquy, those allegations may be disregarded as palpably incredible and entirely unreliable. *United States v. Lemaster*, 403 F.3d 216, 221 (4th Cir. 2005).

Considering the record before the Court, the undersigned **FINDS** Hall's claim of innocence to be "so palpably incredible, so patently frivolous or false as to warrant summary dismissal." *White,* 366 F.3d at 296-97. Hall entered into a plea agreement in which he unequivocally admitted to mailing threatening letters to more than twenty prospective jurors in his pending state criminal trial. (ECF No. 34 at 10). At his Rule 11 hearing, Hall described in his own words what he did that made him guilty of the charge, stating, "I made some threatening letters and sent them through the mail to prospective jury members." (ECF No. 60 at 32). He elaborated that he mailed the letters in "one of the blue boxes, postal boxes in Mason County" that were "outside on the street." (*Id.* at 34). Hall also clarified that he "was not the one that physically put it into the mailbox" and that he "was actually the passenger" in the vehicle, but confirmed that the driver of the vehicle put the items in the mailbox at Hall's direction. (*Id.* at 34-35).

To refute the sworn statements he made at the hearing, Hall offers nothing more than a confusing and factually unsupported argument. He provides no plausible explanation for why he would plead guilty if he were innocent of the charges. In contrast, the Presentence Report highlights a significant body of evidence supporting Hall's guilt, including a voluntary written statement made by Hall's wife. (ECF No. 50 at

11). Moreover, Dr. Dreyer specifically opined that "Mr. Hall [had] the mental capacity to form requisite intent at the time of the crime for which he is accused." (ECF No. 85-1 at 8). Hall fails to produce any evidence to support a contention of actual innocence. Consequently, the undersigned **FINDS** that Hall's claim of innocence is palpably incredible and should be summarily dismissed.

## V.    <u>Proposal and Recommendations</u>

For the reasons set forth above, the undersigned respectfully **PROPOSES** that the District Court accept and adopt the findings proposed herein and **RECOMMENDS** the following:

1.    Movant's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255  (ECF No. 68) be **DENIED**;

2.    Movant's Motion to Proceed Without Prepayment of Fees and Affidavit (ECF No. 67) be **DENIED**; and

3.    This civil action be **DISMISSED, with prejudice,** and removed from the docket of this Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de*

*novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to the Movant, Respondent, and any counsel of record.

**FILED**: March 15, 2013.

Cheryl A. Eifert
United States Magistrate Judge